# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 16-1509V
**Filed October 24, 2018**
(Not to be published)

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                    *
MARTHA SHACKELFORD,                 *
                                    *
        Petitioner,                 *   Findings of Fact; Ruling on Onset;
                                    *   Shoulder Injury Related to Vaccine
    v.                              *   Administration (SIRVA).
                                    *
SECRETARY OF HEALTH                 *
AND HUMAN SERVICES,                 *
                                    *
        Respondent.                 *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*Bruce W. Slane,* The Law Office of Bruce W. Slane, PC, White Plains, NY, for Petitioner
*Colleen C. Hartley,* U.S. Department of Justice, Washington, DC, for Respondent

## RULING ON ONSET[1]

**Oler**, Special Master:

      On November 14, 2016, Martha Shackelford ("Mrs. Shackelford" or "Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act" or "Program"). The petition alleges that the influenza ("flu") vaccination Mrs. Shackelford received on August 26, 2015, caused her to suffer from Shoulder Injury Related to Vaccine Administration ("SIRVA"). Petition at 1.

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I intend to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

During the pendency of this matter, Petitioner submitted two affidavits that she authored, along with affidavits prepared by her sister and her son. The facts Petitioner presented in her affidavits relating to the onset of her medical symptoms differed from some of the facts documented in Petitioner's medical records. When discrepancies exist between medical records and affidavits, "Vaccine Rules 3(b) and 8(c), and the principles of fairness that underlie them, counsel in favor of holding an evidentiary hearing." *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006). Accordingly, I held a hearing on May 1, 2018 in Washington, DC to determine the date of onset of Mrs. Shackelford's symptoms of left shoulder pain.

After carefully considering the testimony of the witnesses, the medical records, affidavits, and the documentary evidence produced after the hearing, I find that Petitioner's left shoulder pain began within 48 hours of her flu vaccination.

## I. Procedural History

### A. Special Processing Unit

This case was initially assigned to the special processing unit ("SPU") overseen by Chief Special Master (CSM) Dorsey. SPU Initial Order, ECF No. 5. Petitioner filed her affidavit, medical records, and additional documentation on November 16, 2017. *See* Exs. 1-5, ECF Nos. 7-1 through 7-5. Petitioner filed her statement of completion on November 22, 2016, indicating that the record was complete. ECF No. 9.

From late November 2016 to mid-April 2017, Petitioner continued to file additional medical records. Petitioner filed exhibits on the following dates: March 1, 2017 (Ex. 6, ECF No. 13-1); March 23, 2017 (Ex. 7, ECF No. 16-1); and April 20, 2017 (Ex. 8, ECF No. 19-1). On April 20, 2017, Petitioner filed an amended statement of completion indicating that the record was complete. ECF No. 21.

On May 19, 2017, Respondent filed a status report indicating that he wished to continue litigating this matter and proposed a Rule 4(c) Report deadline to be scheduled in this case. ECF No. 22. In response, CSM Dorsey set Respondent's Rule 4(c) Report deadline (non-PDF Order of 5/19/2017); Respondent filed his Rule 4(c) Report on July 17, 2017 (ECF No. 24). In his Rule 4(c) Report, Respondent stated that this case was not appropriate for compensation under the terms of the Vaccine Act (ECF No. 24 at 2), arguing, among other things, that "no contemporaneous medical records have been filed that support a rapid onset of shoulder pain after receiving the flu vaccine," and that the first reference to left shoulder pain reflected in the medical records is more than six months after the administration of the flu vaccine at issue (*id.* at 7).

### B. Case Proceedings Under Special Master Roth

This case was transferred out of the SPU on July 21, 2017, and was re-assigned to Special Master Mindy Roth. *See* ECF Nos. 25-26. Special Master Roth held a status conference on August 15, 2017 (minute entry of 8/15/2017), during which she requested that, prior to scheduling a fact hearing, Petitioner should file additional medical records and supportive evidence substantiating Petitioner's allegations as reflected in her affidavit (Order of August 16, 2017, ECF No. 27 at 2).

Petitioner submitted a status report on September 28, 2017, stating that she had "filed all medical records documenting treatment of her shoulder injury." ECF No. 28.  Concurrently, Petitioner filed a motion for an enlargement of time in which to file affidavits from Petitioner's son, Shayne Shackelford, and sister, Laura Dominy.  ECF No. 29.  Special Master Roth granted that motion.  Non-PDF Order of 9/28/2017.

Petitioner filed an affidavit from Laura Dominy on November 1, 2017 (Ex. 9, ECF No. 30-1), and filed an affidavit from Shayne Shackelford on November 3, 2017 (Ex. 10, ECF No. 32-1).  Petitioner submitted her supplemental affidavit on November 21, 2017.  Ex. 11, ECF No. 36-1.

Special Master Roth held a status conference on January 10, 2018 (minute entry of 1/10/2018).  Petitioner's counsel requested a fact hearing in order to afford Petitioner an opportunity to testify regarding the onset of her alleged left shoulder injury.  ECF No. 39.  Special Master Roth granted that request, and ordered both parties to submit a joint status report suggesting dates in early December 2018 to hold the fact hearing in this case.  *Id*.

### C. Proceedings After This Case Was Reassigned To My Docket

This case was reassigned to my docket on January 11, 2018.  ECF No. 40.  I issued a scheduling order on January 12, 2018, informing both parties that I was available to conduct a fact hearing at an earlier date than the time period outlined in Special Master Roth's Scheduling Order of January 10, 2018.  The parties filed a joint status report on January 24, 2018, stating their dates of availability in May 2018.  ECF No. 42.  I issued a Fact Hearing Scheduling Order on January 30, 2018, in which I set the video teleconference (VTC) fact hearing date for May 1, 2018.  ECF No. 43.

I held a fact hearing on May 1, 2018.  Petitioner and her son, Shayne Shackelford, testified via VTC regarding the onset of Petitioner's symptoms after her August 26, 2015 flu vaccination.  Petitioner's status report of April 16, 2018, ECF No. 48; *see also* minute entry of 5/8/2018.  Petitioner's sister, Laura Dominy, testified in person in Washington, DC.  *Id*.  At the conclusion of the fact hearing, I requested that Petitioner file additional records that were referenced by Petitioner and her witnesses during their testimony.  Tr. at 225-31.

Petitioner filed some of those additional records on: May 2, 2018 (Ex. 12, ECF No. 50-1); May 31, 2018 (Ex. 13, ECF No. 54-1), and June 18, 2018 (Ex. 14, ECF No. 56-1).  On June 25, 2018, Petitioner filed a status report highlighting the additional records that still remained outstanding, and requested a status conference to address those outstanding records.  ECF No. 58.  I set the status conference date for July 20, 2018.  Non-PDF Order of 7/11/2018.  In the interim period prior to the status conference, Petitioner filed additional records on July 17, 2018 (Ex. 15, ECF No. 59-1), and July 20, 2018 (Ex. 16, ECF No. 61-1).

I held a status conference on July 20, 2018, during which the parties discussed the additional documentation and medical records that had been filed subsequent to the fact hearing, and the records that still remained outstanding.  Status Conference Order issued on July 24, 2018, ECF No. 64.  The parties agreed that two requested documents still remained outstanding: (1)

Petitioner's credit card billing statements from September 2015; and (2) text messages between Petitioner and Laura Dominy during the onset period at issue in this case, which would corroborate both witnesses' fact hearing testimony. *Id.* At that time, Petitioner's counsel represented that he was unable to obtain text messages between Petitioner and Laura Dominy, as Ms. Dominy was no longer in possession of her old cell phone. *Id.* Both parties thus agreed that Petitioner's counsel would file a status report: (1) updating the Court about his progress towards obtaining the credit card billing statements from September 2015, and 2) affirmatively stating the unavailability of the requested text messages between Laura Dominy and Mrs. Shackelford.[3] *Id.* Also during the status conference, I indicated that I had independently researched on the internet the article submitted as Ex. 12, entitled "Went For A Flu Shot, Got A Shoulder Injury Instead" (Ex. 12), finding that, in the comments section of that article, someone listed as "Martha Shackelford" had commented on that article on September 19, 2015. Status Conference Order issued on July 24, 2018, ECF No. 64. Thus, I relayed to the parties that I would be submitting the comments section of that article into the record of this case for both parties to examine.[4] *Id.*

On October 3, 2018, Petitioner concurrently filed her credit card billing statements from September 2015 (Ex. 17, ECF No. 68-1), and a status report stating that Petitioner's counsel was unable to precisely identify the purchased items reflected in Petitioner's credit card billing statements that would be relevant to the onset issue in this case (ECF No. 70). On October 15, 2018, a member of my staff emailed both parties to file a joint status report stating each parties' respective view as to whether the record was complete for my ruling on factual issues. In response, the parties filed a joint status report on October 16, 2018, stating that both parties deemed the record to be complete for a fact ruling. ECF No. 71. This matter is now ripe for adjudication.

## II. Legal Standards Regarding Fact Finding

Petitioner bears the burden of establishing her claim by a preponderance of the evidence. 42 U.S.C. § 300aa-13(1)(a). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

In order to make a determination concerning factual issues, such as the timing of onset of petitioner's alleged injury, the special master should first look to the medical records. "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium."

---

[3] Petitioner filed a status report on July 24, 2018, affirmatively stating the unavailability of the requested text messages. ECF No. 63. In that status report, Petitioner's counsel stated that he contacted both Mrs. Shackelford and Ms. Dominy, but that neither "ha[s] any saved text messages from the relevant period (August 26, 2015 – February 29, 2016)." *Id.*, parenthetical in the original.

[4] On July 24, 2018, Petitioner's counsel submitted the relevant comments sections from that article into the record of this case. Ex. 16, ECF No. 61-1. On that same date, a member of Petitioner's counsel's law firm emailed a member of my staff affirmatively stating that the submitted comments were in fact written by Mrs. Shackelford. ECF No. 64 at 2, n. 2.

4

*Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2006 WL 3734216, at *8 (Fed. Cl. Spec. Mstr. Nov. 29, 2006). Medical records created contemporaneously with the events they describe are presumed to be accurate and complete. *Doe/70 v. Sec'y of Health & Human Servs.,* 95 Fed. Cl. 598, 608 (2010).

Contemporaneous medical records generally merit greater evidentiary weight than oral testimony; this is particularly true where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992)(citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight")). "Written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later." *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993).

However, there are situations in which compelling oral testimony may be more persuasive than written records--for instance, in cases where records are found to be incomplete or inaccurate. *Campbell*, 69 Fed. Cl. at 779 ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733).

When witness testimony is used to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825 (Fed. Cl. Spec. Mstr. Apr. 10, 2013)(citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). A special master making a determination whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at a hearing, must have evidence suggesting the decision was a rational determination. *Burns by Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993).

### III. The Petition, Affidavits and Documentary Evidence

The Petition filed in this matter states that upon receiving the flu vaccine on August 26, 2015, Petitioner experienced immediate pain, and within one hour of vaccination, her symptoms began to worsen "with a sudden onset of severe pain, muscle aches, weakness, throbbing,

5

tightening, and limited mobility in her left shoulder." Petition at 1. The Petition states that Mrs. Shackelford still suffers from left shoulder pain, weakness, numbness, throbbing, tightening, tingling, discomfort, and stiffness. *Id.* at 3.

### A. Affidavits

#### 1. <u>Affidavit of Mrs. Shackelford</u>

In support of her Petition, Mrs. Shackelford signed her first affidavit on October 31, 2016. In this affidavit, she describes symptoms that developed immediately after she received her flu vaccination on August 26, 2015. "My symptoms began immediately following the vaccination. Within one hour after receiving my vaccination, I suffered severe pain, numbness, muscle aches, weakness, throbbing and limited mobility in my left shoulder and arm." Ex. 3 at 1. Mrs. Shackelford avers that within days, "the pain and numbness began radiating down my left arm into my fingertips." *Id.*

Petitioner states that she did not immediately seek medical attention for several reasons; first, she assumed the pain was temporary and would go away on its own. She took over-the-counter medication, and used heat, liniments, and exercises to alleviate her symptoms. Additionally, Petitioner states she did not see a doctor about her shoulder pain because she was awaiting gastrointestinal surgery scheduled for October 19, 2015, and was preoccupied with this upcoming procedure. *Id.* at 2.

After her surgery on October 19, 2015, Petitioner was hospitalized for one week, and underwent rehabilitation for approximately two weeks. She spent the "next few months recovering from … surgery." *Id.*

Petitioner went to her primary care physician on February 29, 2016, and reported that she had been experiencing left shoulder pain for the past seven months, ever since receiving the flu vaccine. *Id.* She states that she continues to suffer from residual symptoms from her left shoulder injury, to include "pain, weakness, numbness, discomfort, stiffness and loss of range of motion." *Id.* at 3.

#### 2. <u>Supplemental Affidavit of Mrs. Shackelford</u>

On November 20, 2017, Petitioner signed her second affidavit. In this document, she reiterates that she felt immediate pain upon the administration of her August 26, 2015 flu vaccine. Petitioner adds that she told the nurse, "I thought the injection was placed too high in my left shoulder." Ex. 11 at 1. She describes complaining to her son two days after her vaccination about her left shoulder pain. *Id.*

Petitioner further states that she saw her primary care physician on September 3, 2015 and told him that she was experiencing symptoms as a result of her flu shot. "I mentioned the symptoms resulting from the flu shot from a few days earlier to Dr. Noel." *Id.* at 2. A few days after this, Petitioner says that she mentioned her discomfort and pain to her sister. *Id.* Mrs.

6

Shackelford reiterates that she was focused on her scheduled surgery in October and took over-the-counter pain medication to ameliorate her left shoulder symptoms. *Id.*

She saw her primary care physician in December of 2015. During this visit, Petitioner states that she told her about the pain and discomfort she was experiencing in her left shoulder since receiving the flu vaccine in August. *Id.*

Mrs. Shackelford also states that she received a cortisone injection from her orthopedist, Dr. Trenton Carlyle, on March 23, 2016. She clarifies that she only received one cortisone injection: "Although Dr. Carlyle's medical records indicate that I 'previously tried muscle relaxants and steroid injections' to relieve my symptoms, my only treatment for my left shoulder condition was the steroid injection administered by Dr. Carlyle on March 23, 2016 and the course of physical therapy from September 12, 2016 to October 10, 2016." *Id.*

### 3. Affidavit of Mr. Shayne Shackelford

Mr. Shayne Shackelford, Petitioner's son, signed his affidavit on November 2, 2017. He states that he lived with his mother in Katy, Texas until September of 2017. Mr. Shackelford was at work on the day that Petitioner received her flu vaccine. According to Mr. Shackelford, two days later, Petitioner told him that since receiving her flu vaccine, her shoulder was sore, and she was having difficulty using her left arm. "She told me that the nurse gave her the shot too high on her shoulder and she felt the pain immediately." Ex. 10 at 1.

Mr. Shackelford recalls that his mother never had any issues with her left arm or shoulder before her August 2015 flu vaccination. After the vaccination, he "noticed that she had trouble reaching behind her back, reaching for high objects, carrying groceries, sleeping or getting dressed/undressed, opening her car door, driving and cooking." *Id.* at 2. According to Mr. Shackelford, she would also awaken during the night due to the pain. *Id.*

Mr. Shackelford states that Petitioner did not seek immediate medical attention because she assumed the pain was temporary and would go away, and because she was focused on her upcoming gastrointestinal surgery. After her surgery in October of 2015, Mr. Shackelford states that his mother still complained about the pain in her left shoulder and that she suffers the effects of the injury to this date. *Id.* at 3.

### 4. Affidavit of Ms. Laura Dominy

Ms. Laura Dominy, Petitioner's sister, also submitted an affidavit in support of Petitioner's claim. In the document, she describes daily telephonic conversations with her sister as well as bi-weekly visits until Petitioner moved out of state in August of 2017.

Ms. Dominy states she saw Petitioner a few days after she received her flu vaccination. Petitioner said that she felt immediate pain after receiving the vaccine, and that her left shoulder had been hurting ever since. Ms. Dominy "noticed that [Petitioner] had difficulty using her left arm and moving her shoulder." Ex. 9 at 1. Petitioner told her sister that "the pain in her shoulder

7

would constantly awaken her during the night. I noticed that she had difficulty getting dressed/undressed and carrying groceries." *Id.* at 2.

According to Ms. Dominy, Petitioner said that she did not seek medical care for her shoulder because she thought the pain would go away on its own, and because she was preoccupied with her upcoming gastrointestinal surgery. *Id.* After this surgery, Ms. Dominy states that Petitioner continued to experience left shoulder pain. "Martha said she searched on the internet for symptoms of flu shots and decided to see her doctor." *Id.*

### B. Petitioner's Medical Records

Petitioner was born on May 22, 1945. She was 70 years old on August 26, 2015, when she received the allegedly causal flu vaccine at Village Family Practice in Houston, Texas.

#### 1. Petitioner's Medical History Prior to the Flu Vaccination

Petitioner has a pre-vaccine history of benign hypertensive renal disease, pathological fracture of the vertebra, osteoporosis, back pain, hypertension, hypercholesterolemia, hyperlipidemia, stomach ulcers, gastroesophageal reflux disease, restless leg syndrome, chronic kidney disease, diverticulitis of the colon, and emphysema. Ex. 2 at 134-35.

#### 2. The Flu Vaccination and Petitioner's Subsequent Medical History

##### a. Time Period Before Petitioner Reported her Left Shoulder Pain

According to the medical records, Petitioner received a flu vaccine on August 26, 2015 at 9:22 am. The shot was administered in her left arm by Nellie Plata. Ex. 6 at 1. After receiving this vaccine, Petitioner saw Dr. Sandra Lemming to receive surgical clearance for abdominal surgery. The records from Village Family Practice indicate that Petitioner's blood pressure was measured at 11:15 by Nellie Plata, and again at 11:57 by Sandra Lemming. Ex. 2 at 97-98. The records state that "[t]he patient was checked out at 12:29pm by Patricia Fuentes." *Id.* at 110. Although Petitioner avers she told Ms. Plata that she "thought the injection was placed too high in [her] left shoulder" (Ex. 11 at 1), this complaint is not documented in the medical records.

Petitioner next sought medical treatment on August 28, 2015. On that date, she had a routine mammogram that indicated no evidence of malignancy. There were no notations in the record that Petitioner mentioned shoulder pain or had any difficulty with the positioning of her arms during this exam. Ex. 2 at 262.

Petitioner again sought medical attention on September 3, 2015, when she presented to Village Family Practice with a cough. She was treated by Dr. Noel. *Id.* at 75. Although Petitioner contends she told Dr. Noel about "the symptoms resulting from the flu shot from a few days earlier," there is no annotation of such a concern in the record. Ex. 11 at 2; Ex. 2 at 75-78.

On September 23, 2015, Petitioner visited Dr. Sandra Lemming at Village Family Practice with high grade pyloric stenosis, a hiatal hernia, and a six month history of heartburn. Ex. 2 at 61.

8

There is no indication in the medical records that Petitioner mentioned she was experiencing shoulder pain during her visit with Dr. Lemming.

On November 4, 2015, Dr. Buckminster Farrow saw Petitioner in his clinic for a post-operative visit after her distal gastrectomy. In his treatment letter to Dr. Lemming on that same date he writes, "[a]t this time, she is recovering well other than some mild pain at the surgical site." *Id.* at 261. The records indicate that Petitioner did not tell Dr. Farrow she was experiencing shoulder pain when she saw him for a post-operative visit on November 4, 2015.

On December 9, 2015, Petitioner visited Village Family Practice and saw Dr. Caroline Carter for back pain due to osteoporosis with a resulting pathological fracture of vertebra. The records do not indicate that Petitioner mentioned experiencing shoulder pain during her visit with Dr. Carter. *Id.* at 46-49.

Petitioner again visited Dr. Caroline Carter at Village Family Practice on February 9, 2016. During this visit, she reported mild pain with motion in the thoracic spine. *Id.* at 31. The notes from this visit indicate that Petitioner reported she was not experiencing joint pain. *Id.* There is no indication Petitioner mentioned shoulder pain during her visit with Dr. Carter.

### b. The Day Petitioner Reported her Shoulder Pain

On February 29, 2016, Petitioner visited Dr. Caroline Carter at Village Family Practice and reported left shoulder pain that began seven months earlier.[5] The notes from this visit indicate that Petitioner "thinks it happened after she had flu shot." *Id.* at 9. Dr. Carter notes that Petitioner most likely had a triceps strain; she prescribed prednisone and baclofen (a muscle relaxant), and also ordered an x-ray of Petitioner's shoulder. *Id.* at 11. The x-ray found demineralization and "a small marginal osteophyte in the humeral head, subchondral cyst and sclerosis of the greater tuberosity." *Id.* at 22. Dr. Carter referred Petitioner to Dr. Trenton Carlyle at Richmond Bone and Joint. *Id.* at 1.

### c. Time Period After Petitioner Reported her Left Shoulder Pain

On March 23, 2016, Petitioner presented to Dr. Trenton Carlyle at Richmond Bone and Joint for an evaluation of her left shoulder. Dr. Carlyle diagnosed Petitioner with left shoulder impingement syndrome and administered a cortisone injection into the affected area of Petitioner's left shoulder. Ex. 4 at 9-11.

On August 26, 2016, Petitioner went for a follow-up visit with Dr. Carlyle. She reported that her symptoms had improved with the cortisone shot, but that she continued to have pain with overhead activity, dressing, driving, and with left-sided sleeping. Dr. Carlyle advised her to take over-the-counter non-steroidal anti-inflammatory drugs (NSAIDs) and wrote her a prescription for physical therapy (PT). *Id.* at 2-4.

---

[5] Although the medical records state that the onset of her left shoulder pain started seven months earlier, Petitioner received her flu vaccination on August 26, 2015, six months before her visit with Dr. Carter on February 29, 2016. *See* Ex. 6.

9

On September 12, 2016, Petitioner had a PT session with Jennifer Kuck at Memorial Hermann Rehabilitation Hospital. She reported shoulder pain since a flu vaccination in August of 2015. *Id.* at 149-50. Petitioner had seven sessions between September 12, 2016 and October 12, 2016. *See generally* Ex. 8. On October 12, 2016, Petitioner met all goals and exhibited pain-free range of motion of the left shoulder. At that time, Mrs. Shackelford stated her left shoulder "feels fine." *Id.* at 8. As a result, she completed the PT program on this date. *Id.* at 5.

### C. Testimony at the Hearing

#### 1. Testimony of Mrs. Shackelford

Petitioner was born on May 22, 1945. Tr. at 5. Before August of 2015 when she received her flu vaccination, she described herself as someone "in pretty good shape for a person [of her] age." *Id.* at 7. Her main health complaint was due to her osteoporosis. *Id.* As of 2013, Petitioner was not supposed to lift anything heavier than 15 pounds due to her risk of fracturing her vertebrae. *Id.* at 8.

Petitioner described the nurse who administered her vaccine as "in a hurry." *Id.* at 11. She (Nurse Plata) was working fast and did not take the time to listen. *Id.* Petitioner testified that the shot went in high on her shoulder and was administered at an angle. *Id.* She described that the vaccine went into the joint area in the top of her shoulder.

> I thought they were supposed to go into the muscle, but it went into the joint area, the upper -- right at the top of the shoulder. And it hurt a lot. I mean, I've had shots before, but not like that. It … hurt much more than any shot I've ever had in my life.

*Id.* Immediately after receiving her vaccination, Petitioner testified that she felt pain. *Id.* at 12. She knew that it was supposed to hurt when you receive a shot, but she described the sensation as abnormal in terms of the level of pain. *Id.*

Petitioner testified that she noticed it was difficult to close her car door and dry herself off after her shower the day of her vaccination. *Id.* She normally sleeps on her left side, but could no longer do so because of the pain. *Id.* She described the pain as an eight on a scale of 1-10. *Id.* at 14.

Petitioner's next visit with medical personnel took place on August 28, 2015, when she had a mammogram. Ex. 2 at 262. Petitioner described the particular machine used at her visit as upright. Tr. at 52. Petitioner had to place her arms on a handle bar that extended her arms out at a 90 degree angle from her body. *Id.* When asked whether she had any trouble with that exam, Petitioner responded that it hurt to keep her left arm in that position, but because her arm was supported, she was able to complete the testing. *Id.* at 54.

Petitioner testified about her medical appointment on September 3, 2015. The medical records indicate that she was seen for a cough. *Id.* at 55. Petitioner's recollection was that she had a cough that was due to acid reflux. *Id.* at 55-56. She described that her stomach symptoms

10

caused this phenomenon. *Id.* at 56. The medical records state that Petitioner was treated for bronchitis and was given a z-pack. Ex. 2 at 78; Tr. at 56. Petitioner acknowledged that she was treated by Dr. Noel during this visit, but does not recognize his name, and thinks he may have been some type of temporary or substitute physician. *Id.* at 57-58, 146-47. Petitioner testified that she did not remember anything about this medical visit. *Id.* at 146.

Petitioner stated she did not put it together right away that the flu vaccination caused her shoulder pain. *Id.* at 123. "[Y]ou think, well, these people know what they're doing, surely it will be okay." *Id.* When her pain still had not dissipated two weeks later, she began to realize it was from the shot. *Id.* at 124. Approximately three weeks after her flu vaccination, Petitioner searched the internet for potential causes of her shoulder pain. *Id.* at 100. She found and printed the article entitled, "Went for a Flu Shot, Got a Shoulder Injury Instead" on September 19, 2015. Ex. 12; Tr. at 100.

Petitioner visited her doctor again on September 23, 2015 in order to get cleared for her upcoming pyloric stenosis surgery. Ex. 2 at 61-64; Tr. at 63-64. She acknowledged in her testimony that there was no documentation in the medical records concerning left shoulder pain. Tr. at 65.

Petitioner testified that around the time she received her flu vaccination, she was primarily focused on her upcoming surgery for pyloric stenosis[6]. *Id.* at 19. This surgery took place on October 19, 2015. Ex. 3 at 2. Petitioner testified that she spent approximately one week in the hospital recovering after surgery. Tr. at 19. During this time, she was on pain medication that also helped mask her shoulder pain. *Id.* at 20. When she was discharged, Petitioner testified that she took hydrocodone to help manage her pain. *Id.*

Sometime around November or December of 2015, Petitioner's sister, Laura Dominy, brought Petitioner PT exercises to help with her shoulder. *Id.* at 30, 37. According to Petitioner, her sister had injured her shoulder in the past, and still had the exercises at home. *Id.* at 99-100. Petitioner testified that she tried performing the exercises, but they were difficult and she did not know whether she was doing them correctly. *Id.* at 38. Some of the exercises also required her to use a "stretchy rubber band." *Id.* She did not have one, so she ordered one online. *Id.* at 103.

On December 9, 2015, Petitioner visited Dr. Carter. Ex. 2 at 46. Petitioner testified that she told Dr. Carter she was having pain in her shoulder and suspected it was from the flu shot. Tr. at 76. Petitioner said she mentioned her pain in an off-handed manner. *Id.* She agreed that her complaint was not referenced in her medical records: "I guess I didn't make enough of a point of it for her to write anything down or put it in the computer because it's not there." *Id.* at 76-77. Dr. Carter provided Petitioner with a referral to see Dr. Hope Shipman, an endocrinologist, due to

---

[6] Pyloric stenosis is a condition, normally seen in infants, which prevents food from entering the small intestine. "Normally, a muscular valve (pylorus) between the stomach and small intestine holds food in the stomach until it is ready for the next stage in the digestive process. In pyloric stenosis, the pylorus muscles thicken and become abnormally large, blocking food from reaching the small intestine." MAYO CLINIC, *Pyloric stenosis*, https://www.mayoclinic.org/diseases-conditions/pyloric-stenosis/symptoms-causes/syc-20351416 (last accessed October 16, 2018).

11

Petitioner's continuing osteoporosis. Ex. 2 at 164; Tr. at 70-71. According to Petitioner, Dr. Shipman was dire about her prognosis. *Id.* at 71. Dr. Shipman gave her a two-to-three month sample of medication to treat osteoporosis. *Id.* at 71-72. Petitioner understood from Dr. Shipman that this was the best medication to treat her condition. *Id.* at 72. Because Petitioner could not afford it, she did not return to see Dr. Shipman again. *Id.*

Petitioner testified that her stomach incision began leaking clear fluid and that she did not get everything resolved with her stomach surgery until around Christmas 2015 timeframe. *Id.* at 22. During this time her shoulder still hurt, but she learned to live with it. *Id.*

Petitioner visited her primary care doctor, Dr. Carter, on February 9, 2016. Ex. 2 at 34; Tr. at 77. Petitioner agreed there is no reference to left shoulder pain documented in the medical records. *Id.* at 80.

She visited Dr. Caroline Carter again on February 29, 2016. Ex. 2 at 9; Tr. at 81-82. Petitioner said that she generally found Dr. Carter to be more receptive than her other providers. Tr. at 25. Petitioner testified that she reported her shoulder pain to Dr. Carter and that this report was also annotated in the medical records. *Id.* at 82. Dr. Carter gave her steroids, muscle relaxants, and ordered an x-ray. *Id.* at 25. She said Petitioner should contact her if her shoulder did not improve. *Id.* Petitioner next went to Dr. Carlyle at Richmond Bone and Joint. Dr. Carlyle gave her a cortisone shot, which did not help with her pain, therefore she decided to go to PT. *Id.* at 26.

## 2. Testimony of Mr. Shayne Shackelford

Mr. Shackelford was living with his mother when she received the flu vaccination at issue in this case. *Id.* at 155-56. Petitioner began complaining to him about pain in her left shoulder "pretty quickly" after she received the flu vaccination. *Id.* at 162. She told Mr. Shackelford that it hurt to move, lift things, open the car door, put on her seatbelt, and sleep. *Id.* at 160-62. She also said that the nurse who administered the shot seemed like she was in a rush, that there was not enough care in giving the shot, and that the shot was given too high in her arm. *Id.* at 178-79.

After a couple of weeks when Petitioner's shoulder still hurt, Mr. Shackelford began to think that the pain in her shoulder was not just normal soreness. *Id.* at 159, 180. He testified that:

> I really thought that it would be a temporary thing, like I've got shots before and been sore afterwards. And she was telling me that this wasn't a normal soreness from a shot, this was something different, so I figured it would pass. And I got more concerned as time went by. I figured it would go away in a couple of days; it didn't.

*Id.* at 179-80. He encouraged Petitioner to have a doctor look at her shoulder. *Id.* at 181. Mr. Shackelford described Petitioner's shoulder pain as an added problem on top of the main problem. The main problem was Petitioner's upcoming stomach surgery. *Id.* at 180.

Mr. Shackelford testified that Petitioner had a lot of anxiety going into her pyloric stenosis surgery. *Id.* at 163. She was especially concerned that she would not be cleared to go through the surgery due to problems with her insurance. *Id.*

Mr. Shackelford helped care for his mother after this surgery. *Id.* at 163-64. Aside from helping her in the home, Mr. Shackelford also went grocery shopping for Petitioner anytime she needed him to pick something up. *Id.* at 164. As she was recovering at home, Mr. Shackelford testified that Petitioner still complained about soreness in her left shoulder. *Id.* at 165.

### 3. Testimony of Ms. Laura Dominy

Ms. Dominy lived near Petitioner in Katy, Texas until Mrs. Shackelford moved to Arkansas in the August 2017 timeframe. *Id.* at 195, 204. Prior to receiving her flu vaccination in August of 2015, Ms. Dominy testified that her sister did not have any problems with her left shoulder. *Id.* at 205.

Ms. Dominy communicated with Petitioner almost daily when they both lived in Katy. *Id.* at 197. They texted, spoke on the phone, and would typically meet in person two times each week for happy hour. *Id.* at 197, 208. During these conversations, Petitioner told Ms. Dominy that it hurt to use her shoulder to lift things, to get dressed and undressed, and to fasten her seat belt. *Id.* at 198-99. Ms. Dominy testified that Petitioner began making these complaints to her a few days to a week after she got the flu vaccination. *Id.* at 199. Ms. Dominy stated that Petitioner continued to complain of shoulder pain after her stomach surgery, which took place in October of 2015. *Id.* at 201, 212. Ms. Dominy encouraged her sister to see a doctor sometime after Petitioner's stomach surgery. *Id.* at 212.

Ms. Dominy said she suggested Petitioner try physical therapy (PT), and even gave her copies of PT printouts that she had at home. *Id.* at 201-02. She had copies of PT exercises because she had injured her shoulder about four years ago. *Id.* at 210. Ms. Dominy was unsure exactly when she gave these exercises to Petitioner, and only knows it was sometime after Petitioner's shoulder injury. *Id.* at 202.

### D. Documents Produced after the Hearing

Petitioner produced an article she printed from the internet on September 19, 2015 entitled "Went for a Flu Shot, Got a Shoulder Injury Instead". Ex. 12. Petitioner also produced exercise diagrams provided to her by Ms. Dominy (Ex. 13), additional medical records from Memorial Hermann (Ex. 14), email correspondence between Petitioner and Village Family Practice (Ex. 15), Petitioner's September 19, 2015 comment to the article entitled "Went for a Flu Shot, Got a Shoulder Injury Instead" (Ex. 16), and the billing records from Petitioner's Walmart credit card (Ex. 17).

## IV. Findings of Fact

The issue to be addressed is whether the onset of Petitioner's left shoulder pain occurred within 48 hours of her August 26, 2015 flu vaccination. Petitioner has the burden of demonstrating

13

the facts necessary for entitlement to an award by a preponderance of the evidence. § 300aa-12(a)(1)(A). Under that standard, the existence of a fact must be shown to be "more probable than its nonexistence." *In re Winship*, 397 U.S. 358, 371 (1970) (Harlan, J., concurring). In light of the witness testimony, medical records, affidavits, and other documentary evidence presented in this case, and after my careful examination of the record as a whole, I find there is preponderant evidence that the onset of Petitioner's left shoulder pain occurred within 48 hours of her August 26, 2015 flu vaccination.

In her affidavits and during her testimony at the hearing, Petitioner attests that she experienced pain the same day that she received her flu vaccination. I find her testimony on this point to be credible, and further find this testimony is corroborated by the article she printed from the internet on September 19, 2015, as well as her medical appointment with Dr. Carter on February 29, 2016 where she described left shoulder pain since her flu vaccination.

Petitioner testified at the hearing that she had been conducting research on the internet to help determine the cause of her shoulder pain about three weeks after she received her flu vaccination. Tr. at 100. The day before the hearing, she said that she had been looking through her papers and found the actual printout of her research. *Id.* at 100-01. This article, entitled "Went for a Flu Shot, Got a Shoulder Injury Instead" has a date stamp at the bottom of each page which reads "9/19/2015." Ex. 12 at 2-6.[7]

It is reasonable to infer that Petitioner was looking at an article about shoulder pain after vaccination because she was, in fact, experiencing shoulder pain.[8] Her comment after the article further establishes that Petitioner personally researched the connection between her shoulder injury and her vaccination. Accordingly, I am convinced that Petitioner had shoulder pain within 25 days of her flu vaccination. It is further reasonable to conclude that Petitioner did not research shoulder pain resulting from flu vaccine the very day she began to experience such pain. In fact, she testified to this point during the hearing.

---

[7] Petitioner commented on the article the same day she printed it. For context, I have included the comment preceding hers.

> **Dee says:**
> **December 16, 2014 at 9:12 am**
> Dont [sic] wait. If you file a lawsuit later it could cause problems with your case, i.e. 'why did you wait so long' type questions. I found a couple law firms with simple web searches, VaccineInjury.org or MyVaccineLawyer.com are a couple that crop up quite a bit.
>
> **Martha Shackelford says:**
> **September 19, 2015 at 9:19 pm**
> According to the website you have to have had the symptoms for at least six months before they can help you[.]

Ex. 16.

[8] In arriving at this conclusion, I have determined that the internet printout submitted as Ex 12 is what it purports to be, and has not been altered in any way.

14

> So I expected the pain to go away and it didn't, so that's when I started figuring out, well, you know what, that was from the shot….It was around two weeks after the shot was given, and I was still hurting. And I began to realize that it was due from the shot, and the information that I printed out regarding … vaccine injuries … was on September 19th….But it was before that point that I began to suspect that. I just sat down at the computer to do the research on September 19th.

Tr. at 123-24. There is no way to know, based on this one print-out alone, the precise date Petitioner began to feel pain in her left shoulder. However, this document does corroborate Petitioner's claims articulated in her affidavits and in her testimony at the hearing. Specifically, Petitioner has consistently maintained that she felt immediate pain after her vaccination but assumed it would go away. After two to three weeks when it did not go away, she began to "put two and two together." She researched potential causes of her pain and then found and printed Exhibit 12. The existence of this internet printout also diminishes the significance of the fact that there is no mention of shoulder pain in Petitioner's medical records until February 29, 2016. Exhibit 12 is independent objective evidence corroborating Petitioner's shoulder pain. As such, I find it to be highly persuasive.

It merits discussion that Petitioner testified she told several of her medical providers (Nurse Plata, Dr. Noel, and Dr. Carter) that she was experiencing shoulder pain, yet they failed to annotate such concerns in the medical records.

I find it conceivable that Nurse Plata did not document Petitioner's complaint that she (Nurse Plata) placed the needle too high in Petitioner's shoulder. I base this finding on the apparent errors regarding time and type of vaccination in the records,[9] and additionally on the fact that it

---

[9] According to the medical records, Petitioner was administered her flu vaccine by Nellie Plata on August 26, 2015 at 9:22 am. Ex. 6 at 1. The records indicate that "[t]he patient was checked out at 12:29pm by Patricia Fuentes." Ex. 2 at 110. Petitioner disputed the accuracy of the recorded time of her vaccination at hearing. ("I'm saying that the 9:22 has got to be an error. Somebody plugged it in there wrong." Tr. at 144). She testified that she typically made her medical appointments in the early-afternoon timeframe unless she had to take something earlier. Tr. at 13. Village Family Practice is off Interstate 10 in Houston and is approximately 30 minutes from her previous home in Katy, Texas. Tr. at 13, 117-18. The traffic during rush hour made the trip take much longer in the morning than if she were to travel during non-peak hours. *Id.* at 109. Petitioner additionally testified that the clinic did not give vaccinations at the very beginning of their medical appointments. Instead, their routine was to take blood pressure first. *Id.* at 143-44.

I found Petitioner's testimony on the typical scheduling of her appointments to be credible. I find it persuasive that she would not want to spend an extra hour in traffic and thus would schedule her appointments accordingly. Additionally, from my experience as a special master in closely examining medical records, three hours seems like an excessive amount of time for a medical visit. In fact, when reviewing Petitioner's previous medical appointments from 2014-2016, I see the majority of appointments were in the early afternoon, and no appointment took longer than one hour and 20 minutes. (*See* Ex. 2 at 13, 2/29/2016 medical appointment scheduled for 2:10, checked out at 2:44; ex. 2. at 34, 2/9/2016 medical appointment scheduled for 1:40, checked out at 2:14; ex. 2 at 50, 12/9/2015 medical appointment scheduled

would be against her own self-interest to do so. Similarly, due to the entries reflecting either incomplete or inaccurate information in Petitioner's contemporaneous medical records, I do not find an absence of notations by Dr. Noel and Dr. Carter to be case dispositive. I have considered Petitioner's assertions that she mentioned her symptoms of shoulder pain to medical providers as one of many factors in assessing her credibility. Ultimately, after listening to her testimony in conjunction with the other evidence presented, I find Petitioner to be a credible witness.

Although this is a close case, I find the internet printout from September 19, 2015 to be persuasive evidence. It lends truth to Petitioner's claims and enables her to meet her burden in this case.

## V. Conclusion

I find that the affidavits submitted by and on behalf of Petitioner, the testimony, the medical records, and in particular, the other documentary evidence work in concert to provide preponderant evidence that Petitioner's left shoulder pain began within 48 hours of her August 26, 2015 flu vaccination.

The following is therefore ORDERED:

By no later than December 10, 2018, Petitioner and Respondent shall file a joint status report updating me on their proposed next steps in the case based on the facts articulated in this ruling.

**IT IS SO ORDERED.**

**s/Katherine E. Oler**
Katherine E. Oler
Special Master

---

for 2:20, time checked out not documented; ex. 2 at 65, 9/23/2015 medical appointment scheduled for 2:30, time checked out not documented; ex. 2 at 79, 9/3/2015 medical appointment scheduled for 2:40, time checked out not documented; ex. 2 at 131, 8/7/2015 medical appointment scheduled for 2:15, checked out at 3:03; ex. 2 at 150, 6/18/2015 medical appointment scheduled for 11:10, checked out at 12:09; ex. 2 at 169, 4/28/2015 medical appointment scheduled for 11:30, time checked out not documented; ex. 2 at 185, 2/10/2015 medical appointment scheduled for 10:40, time checked out not documented; and ex. 2 at 205, 7/10/2014 medical appointment scheduled for 2:30, checked out at 3:48). Finally, the record from her 8/26/2015 visit indicates that "immunizations administered this visit" included "Pneumococcal conjugate PCV 13" by Nellie Plata with a date completed as 2/11/2015. Ex. 2 at 111. It appears this entry is in error and was never removed from the record when it was performed at an earlier date (a similar error appears throughout these records). Because of these factors, I find that the specific time of 9:22 noted in the medical records as the time of vaccination is unreliable and was likely entered in error.